IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STATE FARM MUTUAL | : | |
| AUTOMOBILE INSURANCE CO., | : | |
| Plaintiff | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 05-3391 |
| | : | |
| DIANE F. HUGHES, et al., | : | |
| Defendants | : | |

**MEMORANDUM OPINION**

DAVID R. STRAWBRIDGE,                                                                July 7, 2006
UNITED STATES MAGISTRATE JUDGE

## I.      INTRODUCTION

Plaintiff State Farm Mutual Automobile Insurance Company ("State Farm") brought this declaratory judgment action against Defendants Diane F. Hughes and Douglas C. Hughes (collectively, the "Hugheses") seeking a determination of its obligations under the Motor Vehicle Financial Responsibility Law, 75 Pa. Cons. Stat. §§ 1701, *et seq.* (the "MVFRL").[1]  State Farm asks this Court to declare that the two automobile insurance policies State Farm issued to the Hugheses provide underinsured motorist coverage with limits of $25,000 per person and $50,000 per occurrence for all underinsured motorist claims arising out of an accident of September 27, 2001 in which Mr. Hughes was seriously injured.  The parties consented to magistrate judge jurisdiction and seek to have the matter resolved on cross-motions for summary judgment.  They have stipulated to a number of facts and to the authenticity of pertinent documents which are appended as exhibits to their stipulation.  (Doc. No. 16.)  Presently before the Court are the parties' cross-motions for

---

[1] Plaintiff properly invokes the diversity jurisdiction of the Court and seeks declaratory judgment pursuant to 28 U.S.C. § 2201.

summary judgment.  (Doc. Nos. 17, 18.)

For the reasons set forth below, we will grant State Farm's motion and deny the Hugheses' motion.

## II.    FACTUAL BACKGROUND

Diane Hughes, the first named insured, obtained automobile insurance coverage with State Farm in 1987.  On February 11 of that year, she signed two applications for coverage using the company's pre-printed forms.  (Stip.  ¶¶ 6, 11.)  Both applications contained a pre-printed boxed section, labeled "COVERAGES,"[2] in which various types of available coverage were listed, calling for the amount of coverage and applicable premium for each type of coverage to be written in by hand.  The text at the top of this boxed section stated that "THE INSURANCE APPLIED FOR IS ONLY FOR THE COVERAGES INDICATED BY SPECIFIC PREMIUM ENTRY."  The first type of coverage listed was identified as "BIPD" and was accompanied by a handwritten notation "50/100" and a premium.    Further down the box, the type of coverage identified as "UNINS./UNDERINS. MOTOR VEHICLE"[3] was accompanied by the handwritten notation "25/50" and a premium.  Mrs. Hughes's signature appeared immediately to the right of the "COVERAGES"

---

[2] Throughout this opinion, we use quotation marks and capital letters for those words and phrases that appear in capital letters in the underlying documents.

[3] Uninsured motorist (or "UM") coverage provides protection "for persons who suffer injury arising out of the maintenance or use of a motor vehicle and are legally entitled to recover damages therefor from owners or operators of uninsured motor vehicles."  75 Pa. Cons. Stat. § 1731(b).  An uninsured motor vehicle is one for which there is no liability insurance available. *Id.* § 1702.  Underinsured motorist (or "UIM") coverage provides protection "for persons who suffer injury arising out of the maintenance or use of a motor vehicle and are legally entitled to recover damages therefor from owners or operators of underinsured vehicles."  *Id.* § 1731(c).  An underinsured motor vehicle is one "for which the limits of available liability insurance and self-insurance are insufficient to pay losses and damages."  *Id.* § 1702.

section and under a pre-printed statement representing that she had "read this application" and that

"the limits and coverages were selected by me." (Exs. A, E.)

On the same day she signed the applications, Mrs. Hughes signed an "Acknowledgment of

Coverage Selection" form pertaining specifically to her "PENNSYLVANIA UNINSURED AND

UNDERINSURED MOTORIST COVERAGE." (Stip. ¶¶ 7, 12; Exs. B, F.) On this form,

immediately under an "IMPORTANT NOTICE," Mrs. Hughes acknowledged her understanding of

the availability of uninsured and underinsured motorist protection "as well as [her understanding of]

the benefits and limits [she had] selected." (Stip. ¶¶ 7, 12; Exs. B, F.) The "Acknowledgment of

Coverage Selection" portion of the page explained that:

> Pennsylvania law requires that no motor vehicle liability insurance
> policy shall be delivered or issued for delivery unless coverage is
> provided for bodily injury for persons who are legally entitled to
> recover damage from owners or operators of uninsured and
> underinsured motor vehicles.
> Uninsured Motor Vehicle and Underinsured Motor Vehicle –
> Coverage U must be written at limits equal to the Bodily Injury limits
> unless the named insured selects lower limits. (Minimum limits are
> the financial responsibility limits for bodily injury liability.)

(*Id.*) Beneath that, the text continued:

> I acknowledge that:
> 1. I have been given the opportunity to purchase Coverage U limits
> up to my bodily injury liability limits; and
> 2. I select Coverage U limits of $_____/$_____ in lieu of the
> higher limits offered to me.
> I understand that this acknowledgment of coverage selection shall be
> applicable to the policy of insurance on the vehicle described below,
> on all replacement policies, and on all renewals of either this policy
> or any replacement policy, unless I request in writing higher limits of
> liability for such coverage.

(*Id.*) Mrs. Hughes signed the acknowledgment immediately below this text. The blanks in this text

indicating alternative "Coverage U" limits, however, were not filled in.  (*Id.*)

Following the enactment of MVFRL amendments and new regulations issued in 1990, State Farm sent the Hugheses forms giving them the option of either retaining or making certain changes to various components of their coverage under both of the policies.  These documents, known as "Act 6" forms, asked the Hugheses to select one of three options relating to underinsured motorist benefits: retaining existing stacked coverage at stated limits; un-stacking the policies but keeping existing stated coverage limits; or rejecting underinsured motorist coverage altogether.  Diane Hughes completed both forms and, on each, endorsed with her signature the pre-printed option that read: "I want to retain my current stacking underinsured Motor Vehicle - Coverage W with limits of $25,000/$50,000 at a premium of $[ ]."  (Exs. C, G.)[4]

The next significant event in the history of this case occurred in 1997, when the Hugheses elected to increase the bodily injury limit of liability applicable to both policies.  These limits were increased from $50,000 per person and $100,000 per accident to $100,000 per person and $300,000 per accident.  (Stip. ¶ 15; Ex. I.)  The record reflects a "coverage change" only with respect to "BI," i.e., bodily injury.  (*Id.*)  State Farm did not request nor did it obtain from the Hugheses any waivers or acknowledgments as to underinsured motorist limits at the time the bodily injury liability limits were raised.  (Stip. ¶ 18.)

State Farm did, however, send the Hugheses renewal notices listing the premiums and limits attributed to the various components of their policies.  (Stip. ¶¶ 9, 14; Exs. D, H.)  The parties agree that there were seventeen of these notices sent at six-month intervals on the two policies between

---

[4] The amount of the premium under one policy was $7 and under the other policy was $8. *See* Exs. C, G.

4

1997 and the 2001 accident, all of which clearly identified policy coverage and limits of, *inter alia*, "Liability Bodily Injury 100,000/300,000" and "Underinsured Motorist Bodily Injury 25,000/50,000."[5]  (Exs. D, H.)

On September 27, 2001, Douglas Hughes was seriously injured in a motor vehicle accident while operating one of the cars insured under the State Farm policies.  (Stip. ¶¶ 3, 5.)  The other driver involved in the accident was insured with another company, which paid to Mr. Hughes the liability limits under its policy.  (Stip. ¶ 4.)  The Hugheses then sought payment from State Farm under the underinsured motorist provisions of their policies.  State Farm responded with a payment of $50,000, representing the stacked benefits under the UIM coverage limits set out in the applications, the Act 6 forms, and the seventeen renewal notices.  (Stip. ¶ 20.)  The Hugheses have sought additional underinsured benefits from State Farm, taking the position that the underinsured motorist coverage under each policy became $100,000 in 1997 when the bodily injury liability limits were increased to that amount.  (Stip. ¶ 21; Ex. K.)

On June 30, 2005, State Farm filed this declaratory judgment action asking this Court to declare that each of the policies provided underinsured motorist coverage in the amount of $25,000 per person and $50,000 per occurrence for all underinsured motorist claims arising out of the accident of September 27, 2001.  (Doc. No. 1.)  On February 15, 2006, the parties submitted their joint stipulation of facts with pertinent exhibits.  (Doc. No. 16.)  On February 17, 2006, they filed cross-motions for summary judgment.  (Doc. Nos. 17, 18.)  On February 28, 2006, both parties filed

_____

[5] From the date of the accident to the filing of the complaint in this matter on June 30, 2005, State Farm issued an additional fifteen renewal notices to the Hugheses regarding their two policies.  These, too, reflect bodily injury liability coverage of $100,000/$300,000 and UM/UIM coverage of $25,000/$50,000.  (Exs. D, H.)

their opposition to the other's summary judgment motion.  (Doc. Nos. 19, 20.)  On March 3, 2006, State Farm filed a further brief in opposition to the Hugheses' motion.  (Doc. No. 22.)  On March 17, 2006, both parties filed a supplemental brief addressing the recent Pennsylvania Superior Court decision, *Blood v. Old Guard Insurance Co.*, 894 A.2d 795 (Pa. Super. Ct. 2006).  (Doc. Nos. 23, 24.)  Oral argument was held on April 3, 2006.

## III.    SUMMARY OF PARTIES' CONTENTIONS

### A.    The Hugheses' Contentions

The Hugheses contend that State Farm must provide underinsured motorist (or "UIM") coverage to them in the amount of $100,000 per person and $300,000 per occurrence under each policy, for a total of $200,000 per person.  The Hugheses argue that the MVFRL requires that the insurer provide UM/UIM coverage "in amounts equal to the bodily injury liability coverage" limits of the policy, 75 Pa. Cons. Stat. § 1731, unless the insured requested in writing UIM coverage in a lower amount (and assuming the insured did not waive all UM/UIM coverage).  The Hugheses then argue that the forms completed by Diane Hughes in 1987 for each policy indicated that she selected UIM coverage at the same limits as the bodily injury liability coverage.  They contend that the forms presented to Mrs. Hughes by State Farm which were entitled "PENNSYLVANIA UNINSURED AND UNDERINSURED MOTORIST COVERAGE (Acknowledgment of Coverage Selection)" advised her that UIM coverage would be provided at the same limits as the bodily injury coverage unless she selected lower limits, which, according to the Hugheses, she did not do.  *See* Exs. B, F. The Hugheses then contend that their UIM coverage continued to be tied to, and equal to, their bodily injury limits when they increased the bodily injury limits in 1997 because they did not request lower UIM coverage limits.

### B.     State Farm's Contentions

State Farm argues that Diane Hughes requested UIM coverage limits of $25,000 per person and $50,000 per occurrence in both the actual insurance applications she signed in 1987, on which the requested coverage was for, *inter alia*, bodily injury liability in the amount of "50/100" but UM/UIM coverage of only "25/50," and the Act 6 forms signed in 1990, in which she endorsed the option of "retain[ing]" her "current" underinsured motorist coverage of "$25,000/$50,000."  State Farm asserts that these documents satisfy the requirement of the MVFRL that "requests" for lower UIM coverage be made "in writing."   State Farm further contends that the fact that the Acknowledgment of Coverage Selection forms (Exs. B and F) completed by Mrs. Hughes in 1987 contain uncompleted blanks in the section inviting the insured to identify lower UIM policy limits is of no consequence in light of these other writings.  State Farm finally asserts that the subsequent increase by the Hugheses of their bodily injury liability coverage limits did not effect a change in their UIM coverage limits because the MVFRL did not require State Farm to make any further inquiry into the Hugheses' wishes with respect to UIM coverage.  State Farm also points out that the Hugheses were provided with numerous renewal notices between 1997 and the 2001 accident reflecting the lower $25,000/$50,000 UM/UIM coverage limit.

## IV.    CHOICE OF LAW

When a federal district court exercises diversity jurisdiction, as we do here, it must apply the substantive law as decided by the highest court of the state which provides the law governing the action.  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  As this dispute arises out of a claim under an insurance policy written in Pennsylvania for insureds who reside in Pennsylvania and relates to a motor vehicle accident that occurred in Pennsylvania, we will apply Pennsylvania law.

7

*See* Stip. ¶¶ 2, 3, 5.  In so doing, we must predict how the Pennsylvania Supreme Court would determine any questions of substantive law necessary for the resolution of the matter before us which it has not yet addressed.  *Borman v. Raymark Indus., Inc.*, 960 F.2d 327, 331 (3d Cir. 1992).  In such a case, we are to "give due regard, but not conclusive effect, to the decisional law of lower state courts."  *Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000).  Decisions of the Pennsylvania Superior Court "should be accorded significant weight" absent an indication that the state Supreme Court would rule differently.  *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 304 n.6 (3d Cir. 1995).

## V.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  *Id.*  Where there are no material underlying facts in dispute, disposition of an insurance action on summary judgment is appropriate.  *McMillan v. State Mut. Life Assurance Co. of Am.*, 922 F.2d 1073, 1074 (3d Cir. 1990).

## VI.    DISCUSSION

In that the resolution of this dispute comes down to a matter of statutory interpretation and an analysis of decisional law, we will first discuss the statutory scheme, how other courts have addressed that scheme, and finally its applicability to the facts of this case.

A.      The MVFRL

The MVFRL was enacted in Pennsylvania in 1984 in response to rising insurance costs created

by the prior insurance scheme, which had required insurers to provide unlimited medical coverage

— which, in turn, led to an increasing number of uninsured motorists.  *See Lewis v. Erie Ins. Exchg.*,

793 A.2d 143, 150 (Pa. 2002) (reviewing history of Pennsylvania motor vehicle insurance laws).

When first enacted, the MVFRL required that all automobile liability insurance policies issued in

the Commonwealth include UM/UIM coverage.  *See* 75 Pa. Cons. Stat. § 1731 (superseded).

However, consistent with a growing trend toward providing consumers with options to reduce their

insurance costs, the MVFRL permitted insurers to issue policies with UM/UIM coverage limits that

were lower than the bodily injury liability limits (although still subject to a statutorily-mandated

minimum amount) if a named insured so "request[ed] in writing."  *See* 75 Pa. Cons. Stat. § 1734

(superseded).

At the time State Farm issued the policies to the Hugheses in 1987, the pertinent provisions

of the MVFRL provided:

> § 1731.  Scope and amount of coverage
> (a) General rule. — No motor vehicle liability insurance policy shall
> be delivered or issued for delivery in this Commonwealth . . . unless
> uninsured motorist and underinsured motorist coverages are provided
> therein or supplemental thereto in amounts equal to the bodily injury
> liability coverage except as provided in section 1734 (relating to
> request for lower or higher limits of coverage).
> . . .
> § 1734.  Request for lower or higher limits of coverage
> A named insured may request in writing the issuance of coverages
> under section 1731 (relating to scope and amount of coverage) in
> amounts less than the limits of liability for bodily injury but in no
> event less than the amounts required by this chapter for bodily
> injury. . . .

75 Pa. Cons. Stat. §§ 1731, 1734 (superseded).  The MVFRL also required that insurers make available for purchase various types of coverage up to designated amounts (including UIM motorist coverage up to at least $100,000 per person and $300,000 per accident) and that insurers advise their insureds of these available benefits "at the time of application for original coverage."  75 Pa. Cons. Stat. § 1791.  This required disclosure, entitled "IMPORTANT NOTICE," also advises: "Your signature on this notice or your payment of any renewal premium evidences your actual knowledge and understanding of the availability of these benefits and limits as well as the benefits and limits you have selected."  *Id.*

In 1990, the General Assembly enacted legislation known as Act 6, which amended the MVFRL.  *See* Act of Feb. 7, 1990, P.L. 11, No. 6.  This legislation provided more consumer choice with respect to insurance coverage by designating UM/UIM coverage "optional" and permitting insureds to reject such coverage completely.  *See Lewis*, 793 A.2d at 150, 152, 154.  Specifically, Act 6 amended Section 1731 to clarify that insurers were required not to "provide" but merely to "offer" UM/UIM coverage.  Act. No. 1990-6, § 9 (amending 75 Pa. Cons. Stat. § 1731(a)).  The Act 6 amendments to Section 1731 required insurers to advise their insureds that they could reject uninsured motorist and/or underinsured motorist coverage.  It also set forth a specific required notice (apart from the Section 1791 "Important Notice" regarding available coverage generally), with which the insured could indicate that he or she knowingly and voluntarily rejected the uninsured motorist and/or underinsured motorist coverage.  *See id.* (amending 75 Pa. Cons. Stat. § 1731(b), (c) and adding (c.1)).  The amendments did not detail the circumstances under which an insurer would be required to inform insureds of their option to reject UM/UIM coverage, but they did require that, in cases where the insured rejected coverage, subsequent renewal notices had to remind the insured of

10

the fact that the policy did not provide protection against damages caused by uninsured or underinsured motorists.  *See id.*  If the insurer did not comply with the requirements regarding the rejection forms as to either UM or UIM coverage, then that coverage would be deemed to be equal to the bodily injury liability limits under the policy.  *See id.* (adding 75 Pa. Cons. Stat. § 1731(c.1)).[6] Act 6 amended Section 1734 to clarify that an insured's request for UM or UIM coverage could be for amounts "equal to" as well as "less than" the bodily injury liability limits and eliminated the requirement that UM/UIM coverage satisfy a statutory minimum amount.  *See* Act No. 1990-6, § 11 (amending 75 Pa. Cons. Stat. § 1734).[7]  Act 6 did not make any significant changes to the Section 1791 required notice regarding available benefits and coverage limits on policies written in Pennsylvania.

In summary, then, and at all times material to this dispute, the MVFRL has required insurers

_____

[6] As it stands in its present form, then, the relevant text of Section 1731 provides:

> (a) Mandatory offering. — No motor vehicle liability insurance policy shall be delivered or issued for delivery in this Commonwealth . . . unless uninsured motorist and underinsured motorist coverages are offered therein or supplemental thereto in amounts as provided in section 1734 (relating to request for lower limits of coverage).  Purchase of uninsured motorist and underinsured motorist coverages is optional.

75 Pa. Cons. Stat. § 1731(a).

[7] In its present form, Section 1734 states:

> A named insured may request in writing the issuance of coverages under section 1731 (relating to availability, scope and amount of coverage) in amounts equal to or less than the limits of liability for bodily injury.

75 Pa. Cons. Stat. § 1734.

to provide applicants with notice of available benefits, including UM/ UIM, at the time of application for original coverage.  *See* 75 Pa. Cons. Stat. § 1791.  It has also required that the notice, the text of which is set forth in the statute, advise the insured that his or her signature acknowledging the notice would be deemed to reflect his or her knowledge of available coverage options.  *See id.*  The MVFRL has also required that the insurer provide UM/UIM coverage in amounts equal to the bodily injury liability coverage limits absent an outright rejection of coverage or selection of lower coverage limits made by a named insured.  *See* 75 Pa. Cons. Stat. §§ 1731, 1734.  Of particular importance to this case, the statute provides for a specific manner of rejection of coverage but does not provide for a specific manner of selection of lower limits other than it be made "in writing."  *See*  75 Pa. Cons. Stat. § 1731(b), (c) (providing specific "rejection" form); *id.* § 1731(c.1) (stating that rejection form not in compliance with statute is void); *id.* § 1734 (permitting insured to "request" lower UM/UIM limits "in writing").

In this case, which involves a selection of lower limits and not an outright rejection of coverage, our task will be to determine whether there was a sufficient request "in writing" to comply with the MVFRL.

### B.    Pennsylvania Supreme Court Interpretations of Section 1731 and 1734

No decision of the Pennsylvania Supreme Court  has addressed the precise issues before us in this case, leaving us to resolve the matter in accordance with how we predict that court would rule. In doing so, we believe it incumbent upon us to carefully review the only Pennsylvania Supreme Court decision identified by either party as relating to the MVFRL in this UM/UIM context, *Lewis v. Erie Insurance Exchange*, 793 A.2d 143 (Pa. 2002).

In *Lewis*, the court was faced with the question of "whether technical requirements imposed

upon insurers under the [MVFRL] to effectuate a first named insured's decision to decline uninsured and underinsured motorist coverage also pertain in circumstances involving acceptance of coverage at designated policy limits." *Lewis*, 793 A.2d at 144. The insureds in *Lewis* purchased a policy from Erie in 1992. The policy provided bodily injury liability coverage of $500,000 per person and per accident. *Id.* A few months later, Mr. Lewis, the first named insured, completed a form provided by Erie relating to UM/UIM coverage. The form contained pre-printed text providing him the opportunity to reduce coverage limits, waive coverage entirely, or to reject stacked limits. *Id.* He signed beneath the option labeled "Reduced Limits of [UM/UIM] Motorist Protection," which contained text acknowledging that he was rejecting coverage limits equal to his bodily injury liability limits and that the limits he selected were $50,000 per person and $100,000 per accident. *Id.* Following an accident, the Lewises claimed they were entitled to UIM benefits at the greater bodily injury liability coverage limits because the UIM coverage options form that Mr. Lewis completed did not conform with the particular pagination requirements of 75 Pa. Cons. Stat. § 1731(c.1). *Id.* at 144-45. Erie contended that Section 1731(c.1) and its technical requirements regarding notices to insureds applied only to rejections of, not reductions in, UIM coverage and that Section 1734, the applicable provision, required only that a request for specific limits for UIM coverage be in writing. *Id.* at 145.

The court agreed with Erie, holding that the technical requirements of Section 1731(c.1) applied solely in circumstances in which an insurer sought to enforce an outright rejection or waiver of UM or UIM coverage and that Section 1731(c.1) did not render invalid Mr. Lewis's request for a specific amount of UIM coverage. *Id.* at 155. In considering this issue, the court examined how the MVFRL and the Act 6 amendments altered the insurance landscape and effectuated the

13

legislative purpose of "enhanc[ing] the ability of insurers to control costs," *id.* at 150, while "preserv[ing], and in some respects expand[ing] upon, core remedial aspects from previously existing schemes." *Id.* at 151.   Reading these provisions *in pari materia*, the court noted that the subject-matter distinction between Sections 1731 (availability, scope and amounts of coverage) and 1734 (request for lower coverage limits) "heightens the significance of the attachment of technical requirements and corresponding remedial provisions to Section 1731 waiver/rejection but not to Section 1734 specific-limits designation." *Id.* at 153.   It also quoted a federal court opinion from the Middle District of Pennsylvania which stated that "[t]he language of Section 1734 is clear on its face; all that is required to request lower limits of coverage is a writing requesting the same from a named insured." *Id.* (quoting *Leymeister v. State Farm Mut. Auto. Ins. Co.*, 100 F. Supp.2d 269, 272 (M.D. Pa. 2000)).   *See also id.* (noting that "requests for specific limits coverage, in contrast to outright waiver/rejection, require not only the signature of the insured, but also, an express designation of the amount of coverage requested").

We conclude that *Lewis* reflects the Pennsylvania Supreme Court's narrow construction of the obligations imposed by the MVFRL on insurers with respect to provision of UM/UIM coverage at bodily injury liability limits and demonstrates that the Supreme Court will not, except where clearly required by the statutory text, permit an insured to escape the consequences of a knowing and intelligent election of benefits.   *Lewis* also demonstrates that the Pennsylvania Supreme Court is concerned that interpretations of the MVFRL be consistent with both the original remedial purpose of the law and the consumer-driven, cost-containment objectives of more recent legislation.

14

**C.**     **The Hugheses made a request in writing for lower UIM limits.**

**1.**     **The 1987 insurance applications**

It is clear to us that the 1987 insurance applications signed by Mrs. Hughes each constituted a "request in writing" within the meaning of Section 1734 for UIM coverage in the amounts of $25,000 per person and $50,000 per accident.  The applications indicated with sufficient clarity that the requested insurance package was comprised of UM/UIM coverage in an amount less than the bodily injury liability limits — the former, included in the designation "UNINS./UNDERINS. MOTOR VEHICLE," was marked "25/50," while the latter, marked "BIPD" and appearing as the first listed item, was marked "50/100."   These designations appeared in the box marked "COVERAGES" on the lower left side of the single-page application.   The elections used commonly-understood shorthand for the amount of coverage per person and per accident.   The applications adequately set forth the amount of UIM coverage requested and demonstrated, on their face, that the amount of UIM coverage would be less than the coverage for bodily injury liability.  Mrs. Hughes, the first named insured, signed the forms and represented that they reflected the coverage she sought.  Section 1734 required nothing further.  The applications satisfied the concerns of Section 1734 of balancing the availability of UIM coverage to protect the insured with the allowance for consumer choice with respect to the premiums associated with the various levels of UIM coverage.  We deem these applications as Section 1734 requests in writing. *Accord, Employers Fire Ins. Co. v. Alvarado*, No. Civ. A. 02-6567, 2005 WL 182717, *3-*4 (E.D. Pa. Jan. 27, 2005) (interpreting *Lewis* to permit signed application form, containing express designation of amount of coverage requested, to constitute valid request for lower UIM coverage under MVFRL); *State Farm Mut. Auto. Ins. Co. v. Ciccarella*, Civ. A. No. 01-1211, 2002 WL 827138 (E.D. Pa. May 1, 2002)

(interpreting *Lewis* and finding that signed application reflecting lesser UIM coverage, where UIM election on application also initialed by applicants, satisfied Section 1734 writing requirement).

The Hugheses argue that the application form should not be relied upon as a Section 1734 request in writing, in part, because the lesser amount of UIM coverage appears in "a minuscule box" not near Mrs. Hughes's signature on the application.  *See* Br. in Supp. of Defs.' Mot. for Summ. Jmt. (Doc. No. 17) at 3-4.  Our examination of the applications causes us to reject this argument.  The "minuscule box" referred to by Defendants is marked "COVERAGES" and takes up approximately one-sixth of the standard 8½" x 11" page.  It also provides, in a clear manner, the amount of coverage sought for each of the various types of coverage, and, for each, the cost of that component of the coverage, concluding with a sum representing the total premium.  The box for the applicant's signature is directly next to the "COVERAGES" box, and Mrs. Hughes's signature is within two inches of the entry for UM/UIM coverage.  We are unable to conclude from our examination of the documents in question that the selection of the UM/UIM coverage options would have been unclear to Mrs. Hughes.

The Hugheses also attack the application forms because the lower UM/UIM designations were filled in by the State Farm agent and not Mrs. Hughes herself.  We find no legal significance in this fact.  This designation was one of many blanks on the application form pertaining to Mrs. Hughes's request for insurance coverage.  While the agent made all of the handwritten entries on the applications, *see* Stip. ¶¶ 6, 11, Mrs. Hughes acknowledged by her signature that she had "read this application" and that "the statements hereon . . . are correct."  The mere fact that Mrs. Hughes did not write the "25/50" UM/UIM election herself does not invalidate the application as a Section 1734

request.[8]

The Hugheses also argue that any designation made by the State Farm agent on the applications should not be deemed Mrs. Hughes's request in light of the Acknowledgment of Coverage Selection forms she signed contemporaneously.  They contend that the fact that Mrs. Hughes did not fill in the blank places for the lower UIM limits on these separate forms means that she did not actually make an election for less UIM coverage.  They assert that the Acknowledgment of Coverage Selection form is the operative writing in this case and, essentially, renders any other writing meaningless.  *See* Br. in Supp. of Defs. Mot. for Summ. Jmt. (Doc. No. 17) at 1 (focusing, in Statement of Question Involved, on "signed acknowledgement [sic] of coverage selection forms for underinsured motorist coverage"); Defs.' Ans. to Pl.'s Mot. for Summ. Jmt. (Doc. No. 19) at ¶ 3 (insisting that issue is whether UIM coverage must be provided in same amount as bodily injury liability coverage in light of signed acknowledgment of coverage election forms "setting forth that State Farm was obligated to provide [UIM] coverage in the same amount as their bodily injury

---

[8] We note here that the Hugheses suggest in their papers that the State Farm agent either carelessly or willfully "ignored" Mrs. Hughes's election to maintain UIM coverage at the bodily injury liability limits and "scrawled down his own selection of lower underinsured motorist coverage" on the application form.  *See* Br. in Supp. of Defs.' Mot. for Summ. Jmt. (Doc. No. 17) at 12.  This characterization of events is not reflected in the stipulation of facts submitted by the parties.  As the Hugheses have represented that "[t]here are no material facts in dispute," *see* Defs.' Mot. for Summ. Jmt. (Doc. No. 17) at ¶ 2, and because we presume that the preparation of the document was done in the ordinary course of business (absent some contrary evidence), we choose to disregard the unsubstantiated allegations presented by the Hugheses.  We note also that the MVFRL seeks to avoid disputes regarding whether an insured's selections were knowingly made.  *See* 75 Pa. Cons. Stat. § 1791 (providing that signature on statutorily-mandated notice of available benefits and limits "evidences your actual knowledge and understanding of the availability of these benefits and limits as well as the benefits and limits you have selected"); *Prudential Prop. & Cas. Ins. Co v. Pendleton*, 858 F.2d 930, 936 (3d Cir. 1988) (finding that voluntary signature on Section 1791 notice gives rise to conclusive presumption of knowledge of coverage selected).

liability limits"); N.T. 4/3/06 (oral argmt.) at 30.

We do not agree that such a conclusion follows from the facts here.  We recognize that the Acknowledgment of Coverage Selection form and the application form completed for each policy may be read to create an incongruity.  We do not conclude from that, however, that the Acknowledgment of Coverage Selection form is the more reliable document regarding Mrs. Hughes's intent.  To be sure, the Acknowledgment of Coverage Selection form invited Mrs. Hughes to indicate her UIM coverage request, and, had she completed the blanks, that document would have constituted an additional "request in writing" for UIM coverage in amounts other than the bodily injury liability limits.  However, we do not believe that completion of that form was necessary to effectuate a "request in writing" for reduced coverage within the meaning of Section 1734, or, conversely, that the failure to designate lower limits on that form means that there was no "request in writing" for reduced coverage, in light of the clear written request in the applications for UM/UIM coverage at the $25,000/$50,000 limit.  The MVFRL does not require a particular form be completed in order to satisfy Section 1734 regarding the election of lesser UIM coverage; it only requires a request in writing for reduced coverage limits.[9]  *See Lewis*, 793 A.2d at 153 (contrasting technical requirements of Section 1731(c.1) and 1734).  Similarly, the fact that the Acknowledgment of Coverage Selection form was prepared by State Farm does not, in our view, give it any heightened status.  *See State Farm Mut. Auto. Ins. Co. v. Ciccarella*, Civ. A. No. 01-1211, 2002 WL 827138, *3 & n.5 (E.D. Pa. May 1, 2002) (noting that, in light of *Lewis*, the fact that insurer may also have employed a separate form for lower UIM limit request is immaterial).  Therefore, the fact that Mrs. Hughes did not request reduced UIM coverage on the Acknowledgment of Coverage Selection form

---

[9] This is true under Section 1734 both as it read in 1987 and as it reads today.

18

is not dispositive; it did not preclude her from making such a "request in writing" in another manner.

Nor do we believe that the Acknowledgment of Coverage Selection Form is entitled to any special weight, as the Hugheses argue, simply because it is a separate document and addresses (at least in the top half of the page) only the subject of UM/UIM coverage.  We rather suggest that one could equally, if not more forcefully, argue that the application form be given greater weight, as it more clearly presents the amount of coverage selected for each of the various categories, including an election of UM/UIM limits in specified amounts that were less than the specified bodily injury liability limits.  The Acknowledgment of Coverage Selection Form does not similarly lay out the amounts of coverage requested by the applicant in relation to the bodily injury liability coverage.  Rather, it informs the applicant that "Pennsylvania law requires that no motor vehicle liability insurance policy shall be [issued] unless coverage is provided for bodily injury for persons who are legally entitled to recover damage from owners or operators of uninsured and underinsured motor vehicles," and that UIM coverage "must be written at limits equal to the Bodily Injury Liability limits unless the named insured selects lower limits."  *See* Exs. B, F.  Beneath that, the applicant is invited to acknowledge that she has "been given the opportunity to purchase Coverage U limits up to [her] bodily injury liability limits; and, in the next numbered paragraph, that she select limits of "$_____/$_____" in lieu of the higher limits offered to her.  *See id.*  Contrary to the gloss the Hugheses put on it, the form does not affirmatively state that the applicant, in this case Mrs. Hughes, wishes to purchase UIM coverage up to her bodily injury liability limits.  We agree with State Farm that the form cannot be fairly read to constitute an acknowledgment by the Hugheses that their UIM policy limits would be equal to the bodily injury limits.

Finally, the Hugheses assert that a recent decision of the Third Circuit Court of Appeals, *Fire*

*& Casualty Co. of Conn. v. Cook*, No. 04-2564, 155 Fed. Appx. 587 (3d Cir. Nov. 9, 2005), bears

on these issues.  We disagree.  In *Cook*, the insured signed a form requesting UIM coverage at a

lower limit than the policy's bodily injury liability limit but left blank the corresponding box to

reduce UM coverage.  The insured later sought UM coverage, and the Third Circuit panel, in an

opinion it designated as "not precedential,"[10] held that he was entitled to UM coverage up to the

same amount as his policy's bodily injury liability limit because of the presumption under Section

1731 that UM and UIM limits will match bodily injury liability limits absent a request in writing

setting forth lower limits.  The court concluded that the insured's failure to indicate an alternative

UM coverage limit on the same form in which he requested a reduction in UIM coverage meant that

the insurer was not relieved of its statutory obligation to issue a policy with UM coverage at the same

limits as bodily injury liability coverage.  Although the insured and the agent apparently both

intended that UIM and UM coverage be at the same lower limit, the court rejected this evidence, as

Section 1734 did not allow for the insured's "intention" to "substitute for the statute's requirement

that the request be made 'in writing.'" *Cook*, 155 Fed. Appx. at 593.[11]  The court also determined

---

[10] Pursuant to the Third Circuit Court of Appeals Internal Operating Procedures, a majority of the panel deciding a case determines whether an opinion is designated "precedential" or "not precedential." 3d Cir. IOP 5.1.  The court designates an opinion as "not precedential" when it "appears to have value only to the trial court or the parties," regardless of whether the court affirms or reverses the trial court and regardless of whether the panel's decision is unanimous. 3d Cir. IOP 5.3.  "The court by tradition does not cite to its not precedential opinions as authority." 3d Cir. IOP 5.7.  The reason given for this rule is that "[s]uch opinions are not regarded as precedents that bind the court because they do not circulate to the full court before filing." *Id.*  However, the IOPs also indicate that drafts of not precedential opinions that are not unanimous, such as *Cook* (in which Judge Weis dissented), *are* circulated in draft to all active judges of the court to provide them an opportunity to request *en banc* consideration before the authoring judge files the opinion.  3d Cir. IOP 5.5.4.

[11] The court also cited *Lewis* for the proposition that a Section 1734 request for lesser UM or UIM coverage requires "an express designation of the amount of coverage requested."  *See*

that other proffered documentary evidence of the insured's intended election — including a written proposal, insurance quote, and pricing work sheet prepared by the agent — did not satisfy the statutory requirement "that the writing be the insured's." *Id.*

The Hugheses argue that we must find, pursuant to *Cook*, that lower UIM coverage limits were not properly requested in accordance with Section 1734. We do not agree, however, that the circumstances of this case are comparable to those in *Cook.* In *Cook*, there was no other writing reflecting lower UM coverage that contained the insured's signature; the insurer instead sought to rely on extrinsic evidence of the insured's intended insurance package. Here, such a writing — the 1987 application — exists. The fact that the list of coverage elections, with their pricing, was completed by the agent rather than the insured does not trouble us in light of Mrs. Hughes's signature on the form acknowledging that she requested the coverages listed therein. We do not read *Cook* to suggest that a request for UIM coverage in amounts less than the bodily injury liability limits must only be made on a particular form; rather, the *Cook* court simply required that the form to which the insurer pointed as evidence of the election of reduced coverage actually reflect such an election by the insured. *See also Cook*, 155 Fed. Appx. at 589 (noting that "the only requirement of Section 1734 is that the insured's request for reduced coverage be in writing . . . and it appears that the writing may take any form").

We find nothing in *Cook* to contradict our conclusion that the Hugheses must be held to the amount of UIM coverage requested by Mrs. Hughes in the 1987 written application. Further, we believe that this conclusion comports with the statutory construction and policies embraced by the

_____

*Cook*, 155 Fed. Appx. at 593 (quoting *Lewis*, 793 A.2d at 153). This requirement was not satisfied in the *Cook* case, as no alternative amount of requested UM coverage was indicated in any document signed by the insured.

Pennsylvania Supreme Court in *Lewis*.

### 2.  The 1990 Act 6 elections

State Farm contends that, even if there were some defect in the Hugheses' UIM election from the 1987 application materials, it properly provided a policy with reduced UIM coverage in accordance with Mrs. Hughes's request in the Act 6 forms completed in 1990.  We agree with State Farm that the election forms Mrs. Hughes executed in 1990 with respect to the policies also satisfy the Section 1734 requirements of a "request in writing" for lower UIM coverage limits.  *See* Exs. C, G.  Again, these forms were signed by Mrs. Hughes and reflect the amount of UIM coverage she desired.  In fact, Mrs. Hughes signed her name immediately beneath the statement: "I want to retain my current stacking Underinsured Motor Vehicle Coverage W with limits of $25,000/$50,000 . . . ."[12]  *See* Exs. C, G.  Even if it were not the case that her then "current" level of UIM coverage was $25,000/$50,000 (if we are incorrect that the 1987 application constituted a valid request for reduced coverage), we conclude, as have other courts in this circuit, that the statement signed by Mrs. Hughes on the Act 6 form satisfies the Section 1734 requirement.  *See Dang v. State Farm Mutual Auto. Ins. Co.*, Civ. A. No. 96-411, 1996 WL 421942, *3 (E.D. Pa. July 19, 1996), *aff'd*, 111 F.3d 126 (3d Cir. 1997) (table); *State Farm Mutual Auto. Ins. Co. v. Vollrath*, 132 Fed. Appx. 414, 417 (3d Cir. 2005) (concluding insured requested in writing lower coverage limits because, *inter alia*, he signed an Act 6 form "stating that he 'wanted to retain [his] current stacking underinsured Motor Vehicle Coverage W with limits of $15,000 / $30,000 at a premium of $13.'").

The Hugheses contend that the Act 6 forms should not be deemed a "request in writing"

---

[12] Given the proximity of Mrs. Hughes's signature to the description of the UIM coverage she was electing, we have no concern, as Defendants expressed with respect to the 1987 application, that she may have been unaware of the amount of her UIM coverage.

within the meaning of Section 1734 because the amount of UIM coverage reflected on the form was already contained in the form and was not written in by Mrs. Hughes herself. The Hugheses further argue that the forms presented them only with the options of retaining stacked UIM coverage or rejecting stacked UIM coverage. We do not agree that these circumstances require a different conclusion.

As we discussed in relation to the 1987 applications, Section 1734 permits an insurer to be relieved of a statutory obligation to provide UM/UIM coverage at the same limits as the insured's bodily injury liability election upon obtaining a request in writing from the named insured for coverage in such alternative amounts.[13] Just as we do not read Sections 1731 and 1734 to impose on the insurer any obligation to provide a specific form in which the insured may make this written request, we do not read those provisions to oblige the insurer to issue UM/UIM coverage at the bodily injury liability limits absent a writing that contains, in the insured's own hand, an indication as to the preferred amount of coverage. We believe the requirements of Section 1734 are satisfied where a document setting forth the UIM limits, and presented as a request for coverage by the applicant or insured, is signed by the applicant or insured. As we concluded with respect to the 1987 applications, we do not find the fact that Mrs. Hughes did not herself write in the numbers $25,000 and $50,000 on the form to have any legal significance.

---

[13] Again, the historical backdrop to the MVFRL's enactment in 1984 was a situation in which an increasing number of motorists failed to carry any insurance due to the cost of policies that provided unlimited medical coverage. *See Lewis v. Erie Ins. Exchg.*, 793 A.2d 143, 150 (Pa. 2002) (reviewing history of Pennsylvania motor vehicle insurance laws). The MVFRL initially required that all automobile liability insurance policies issued in the Commonwealth include UM/UIM coverage but allowed consumers to reduce their insurance costs by electing UM/UIM coverage limits in lower amounts than their bodily injury liability coverage limits. The 1990 Act 6 amendments further enhanced consumer choice by allowing insureds to reject UM/UIM coverage completely and thus further reduce insurance premiums. *See id.* at 150, 152, 154.

Similarly, we do not believe that the format of the Act 6 form precludes it from being a "request in writing" by "a named insured" under Section 1734.  Even if we were to assume that the Act 6 form was primarily intended to confirm that the Hugheses wished to retain stacked UM/UIM coverage, there is nothing to suggest that it did not, at a minimum, reflect in writing Mrs. Hughes's desire that her UIM coverage be at the $25,000/$50,000 limit.  We cannot accept the Hugheses' contention that the perceived context of Mrs. Hughes's endorsement of the $25,000/$50,000 UIM coverage limit on the Act 6 form prevents it from being properly considered as a request under Section 1734 for UIM coverage in those amounts.

We conclude, then, that both the 1987 applications and the 1990 Act 6 forms, whether considered separately or most certainly when considered together, permit State Farm to provide UIM coverage in the amount of $25,000 per person and $50,000 per occurrence under each of the Hugheses' policies.

### D. The lower UIM coverage limits remained in effect when the Hugheses increased their bodily liability coverage limits.

The Hugheses also argue that they were entitled to UIM coverage at their bodily injury liability limits in effect at the time of the accident by virtue of their 1997 increase in their bodily injury liability coverage.  They assert two arguments in support of this position.

First, they argue that the fact of the 1997 increase alone would automatically effectuate a concomitant increase in their UM/UIM coverage limits.  In support of their position, they cite to *Cebula v. Royal & SunAlliance Insurance Co.*, 158 F. Supp.2d 455 (M.D. Pa. 2001), a case in which the court found the insurer to be obligated to provide UIM coverage in amounts equal to bodily injury liability coverage following an increase in the bodily injury liability coverage.  *Cebula*, 158

24

F. Supp. 2d at 459, 462.  In *Cebula*, however, unlike this case, the insureds' UIM limits had always been the same as their bodily injury liability limits because, unlike this case, they had not previously rejected UIM coverage nor requested in writing that their UIM coverage limits be anything other than their bodily injury liability coverage limits.  *Id.* at 459.[14]

The Hugheses' reliance on *Cebula* is premised on their view that, in 1987, Mrs. Hughes "signed acknowledgments identifying that [she and her husband] were seeking underinsured motorist coverage in the same amount as bodily injury coverage."  *See* Br. in Supp. of Defs.' Mot. for Summ. Jmt. (Doc. No. 17) at 11.  Given our unwillingness to accept this premise, however, we do not find *Cebula* supportive of the Hugheses' position.  We conclude that the request by the Hugheses to increase their bodily liability coverage limits did not trigger an obligation on State Farm to increase their already-reduced UIM coverage limits to the same level.

Alternatively, the Hugheses asserted at oral argument that, irrespective of their previous UM/UIM coverage designation, the 1997 increase in their bodily injury liability limits had the effect of raising their UIM coverage to that same level.  This resulted, they argue, from the fact that State Farm did not obtain from them at the time of the 1997 revisions to their policies a coverage selection form confirming that they desired UIM coverage in an amount less than their bodily injury liability coverage.  *See* N.T. 4/3/06 (oral argmt.) at 31-34.  We do not agree.

In support of their position, the Hugheses principally rely upon the Pennsylvania Superior Court decision in *Blood v. Old Guard Insurance Co.*, 894 A.2d 795 (Pa. Super. Ct. 2006).  In *Blood*,

---

[14] The Hugheses are cognizant of this fact, as reflected in their summary judgment papers. *See* Br. in Supp. of Defs.' Mot. for Summ. Jmt. (Doc. No. 17) at 11 (discussing *Cebula* as a case in which "the insureds had never signed a request to reduce their UM/UIM coverage").  Given our conclusion, however, regarding the effect of the 1987 application and Act 6 forms signed by Mrs. Hughes, the facts of *Cebula* are not as similar as the Hugheses believe.

the insureds purchased an automobile policy that provided for $500,000 in bodily injury liability coverage but only $35,000 in UM/UIM coverage. The initial election of the $35,000 UM/UIM limit was not at issue in the appeal and was presumed to have been properly executed. Thereafter, the Bloods requested a reduction of their liability coverage from $500,000 to $300,000 on a coverage selection form provided by Old Guard. The form utilized by Old Guard also invited them to choose from among six different levels of UM/UIM coverage. The Bloods did not check any of the form's options with respect to UM/UIM coverage. *Blood*, 894 A.2d at 796.

Following an accident with an underinsured tortfeasor, the Bloods sought UIM coverage at the $300,000 bodily injury limit level. They argued that because they did not explicitly choose a lower level of UIM coverage when they modified their bodily injury liability coverage, the MVFRL required Old Guard to provide UIM coverage at this bodily injury liability limit. *Id.* at 796-97.

At issue was the question of whether a change (here a reduction) in the bodily injury limit, absent some contrary writing, would automatically bring about a change in the UM/UIM coverage limits under the MVFRL. Relying on dicta from a 2004 decision of a panel of the Superior Court in *Smith v. Hartford Insurance Co.*, 849 A.2d 277 (Pa. Super. Ct. 2004), the *Blood* court stated that "when the liability limits change[,] a new request for lower limits must also be submitted or the statutorily mandated equal limits will apply," *Blood*, 894 A.2d at 797 (quoting *Smith*, 849 A.2d at 281), and that "absent a signed, written election for lesser coverage, the presumed UIM coverage limit is the same as the bodily injury liability coverage limit." *Blood*, 894 A.2d at 798.

As with any case cited as precedent, *Blood* must be considered in the context of its facts.[15]

_____

[15] As Chief Justice Marshall observed some 185 years ago:

It is a maxim not to be disregarded, that general expressions, in

Here, the *Blood* court readily acknowledged that its conclusion was "reinforce[d]" by "[t]he presence of options for declaring the UIM and UM coverage limit" on the form that the Bloods completed to effectuate the change in their bodily injury liability coverage limits.  *Blood*, 894 A.2d at 798.[16] Indeed, the court went so far as to state:

> Had these options not been present on the face of the form signed by the Bloods, Old Guard's contention that the form was capable only of modifying the liability coverage of the policy may have had some merit.  However, those are not the facts present before this Court.

*Id.*

Upon careful consideration of the *Blood* decision, we are not prepared to accept that it is controlling in this case in that we believe this matter involves materially different facts.  The *Blood* court was careful to point out that, at the time the Bloods reduced their bodily injury liability limits, they had been presented with various options with respect to their UIM coverage but did not select any of them.  The *Blood* majority found this fact to be significant and referred to it repeatedly.

---

> every opinion, are to be taken in connection with the case in which those expressions are used.  If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.  The reason of this maxim is obvious.  The question actually before the Court is investigated with care, and considered in its full extent.  Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.

*Cohens v. Virginia*, 19 U.S. 264, 399-400 (1821).

[16] The Old Guard form that the Bloods completed to effectuate the reduction in their bodily injury liability coverage limits, among other changes to their policy, contained various pre-printed options that allowed them to mark their coverage selection.  The Bloods checked the option for bodily injury liability coverage limited to $300,000 but did not similarly place a checkmark next to any of the six different levels offered for UM coverage or the six different levels offered for UIM coverage.  *Blood*, 894 A.2d at 796.

Summarizing its reasoning, the *Blood* court explained:

> [T]he "Pennsylvania Auto Insurance Coverage Selection Form" signed by the Bloods on June 16, 2000, contains an explicit option for selecting lower UIM benefits. No such selection was made, nor was this option crossed off or otherwise rendered inoperative. Consequently, the statutory presumption of UIM policy limits equivalent to the bodily injury liability limits was in effect.

*Blood*, 894 A.2d at 798.

The hypothetical and distinguishable case described by the *Blood* court — where the insureds were not invited to choose among various levels of UM/UIM coverage when making a change in their bodily injury liability limit — is the case before us. There is no evidence here that State Farm presented the Hugheses with any specific form at all, let alone a form containing an explicit option regarding UIM benefits, at the time they increased their bodily injury liability limits. *See* Stip. ¶¶ 15-16 (no waivers or acknowledgments regarding UIM coverage were requested or obtained by Hugheses at the time of, or subsequent to, their increase in bodily injury liability limits).[17] Accordingly, we are unable to accept the Hugheses' proposition that the Pennsylvania Supreme Court, if faced with the facts of this case, would impose upon State Farm the affirmative obligation to obtain a new Section 1734 request in writing from them or suffer the consequence of having the UIM coverage be deemed to be at the same level of coverage as the bodily injury liability coverage limits.

---

[17] We note that the record before us does not even indicate that this change was accomplished by the completion of any form by the Hugheses. The exhibits appended to the parties' stipulation of facts provides, as proof of the change in the bodily injury limits, only a print-out from State Farm's computer system that identifies the Hugheses' policies and indicates that "coverage changes" were made regarding "BI" to "100/300" and "R1/R5 to "R-5." *See* Stip. at Ex. I. This document, which the parties refer to as an "Echo Policy Transactions" page, contains a run date of "2/23/05" and appears to have been generated in conjunction with this litigation. *See* Stip. ¶ 17 & Ex. I.

In addition to the important factual distinctions between *Blood* and this case, we have concerns about the broadly-worded language in the *Blood* opinion that derived from a misplaced reliance on certain portions of the Superior Court panel decision in *Smith v. Hartford Insurance Co.*, 849 A.2d 277 (Pa. Super. Ct. 2004).  The facts of *Smith* involved a rejection by the insured of UIM coverage.[18]  Thus, the *Smith* court's statements regarding the effect of a change in liability limits following a valid request for lesser UIM limits  were extraneous to its decision.  Such dicta should not have been the basis for the *Blood* majority's decisionmaking in a case involving reduced UIM coverage.  *Accord, Nationwide Mutual Ins. Co. v. Merdjanian*, Civ. A. No. 03-5153, 2005 WL 545299, *5 (E.D. Pa. Mar. 7, 2005) (concluding that *Blood* court "mistakenly relied on dicta from *Smith*").[19]

Applying the *Blood* rule in its broadest form also concerns us because the particular

---

[18] *Smith* involved a question of whether a subsequent increase in bodily injury liability coverage limits, following a valid rejection of UIM coverage, required the insurer to obtain a new UIM rejection form or else provide UIM coverage at the same limits as the bodily injury liability coverage.  The insured in *Smith* initially purchased a policy including $300,000 in UM/UIM coverage, later executed a waiver of UIM coverage, and thereafter increased his bodily injury liability coverage limits to $500,000.  Following an accident, the insureds sought UIM coverage from the insurer, contending that a new UM/UIM waiver form was required when their policy's bodily injury liability limits changed because the increase in their bodily injury liability coverage amounted to the purchase of a new insurance policy.  The *Smith* court held that the change in liability limits merely modified an existing contract and did not have the effect of rendering the policy a new insurance contract.  The court looked to Section 1791 of the MVFRL, which requires that an applicant be informed of the various types of coverage available at the time of the policy purchase, and reasoned from that section that no other notice or rejection would be required subsequent to the purchase in order for an insurer to continue to provide a policy that did not include UIM coverage.  *Smith*, 849 A.2d at 279-81.

[19] The *Merdjanian* decision, issued in 2005, analyzed a December 30, 2004 panel decision by the Superior Court in *Blood*.  While this decision was subsequently vacated and replaced by the *en banc* Superior Court *Blood* decision issued on March 2, 2006, the *en banc* court's analysis is consistent with the analysis of the panel as described by Judge Baylson in *Merdjanian*.

propositions from *Smith* upon which the *Blood* court relied in coming to its initial conclusions are not well-supported.  For example, *Blood* cited *Smith* for the proposition that "[c]ase law indicates that when the liability limits change[,] a new request for lower limits must also be submitted or the statutorily mandated equal benefits will apply."  *Blood*, 894 A.2d at 797 (quoting *Smith,* 849 A.2d at 281).  In the *Smith* opinion, this proposition is followed by the citation: "*See generally Cebula v. Royal & SunAlliance Ins. Co.*, 158 F. Supp. [sic] 455 (M.D. Pa. 2001)."  *Smith*, 849 A.2d at 281.  However, as we have set out within, the facts of *Cebula* do not support this blanket, sweeping statement.[20]  This undermines our confidence in the soundness of the *Smith* reasoning, at least with respect to the dicta for which *Smith* is relied upon by the *Blood* majority.  This, in turn, undermines our confidence in the *Blood* court's reasoning.

We note that our concerns regarding the *Blood* analysis are shared by Judge Joan Orie Melvin, who filed a dissenting opinion to the *en banc* majority opinion in *Blood*.  Judge Orie Melvin did not believe that a UM/UIM coverage election was required when the Bloods decreased their bodily injury liability limits.  Accordingly, she disagreed with the majority's conclusion that, in the absence of a request in writing for alternative UM/UIM coverage limits, the presumed coverage limit would be the same as the new bodily injury liability limit.  *Blood*, 894 A.2d at 799 (Orie Melvin, J., dissenting).  Examining Sections 1731 and 1734, Judge Orie Melvin noted that, once a rejection or request for reduction of UM/UIM coverage has been made, "the MVFRL [would] not explicitly require a new UM/UIM sign down form each time a policyholder changes the liability limits."  *Id.* She noted that, at the time the Bloods changed their bodily injury liability limits, they "already had

_____

[20] Again, *Cebula* involved a claim in which UIM limits had always been equal to the bodily injury liability limits in that Cebula, unlike the Hugheses, never waived coverage nor requested in writing that his UIM coverage be written at lower limits.

UM/UIM limits *lower* than the liability limits and . . . they made *no* request to increase or decrease the present UM/UIM limits." *Id.* (emphasis in original).  She believed the majority's reasoning "that the Bloods' written request to *reduce* [bodily injury] liability limits could operate to *increase* UM/UIM limits" was "illogical." *Id.* (emphasis in original).  She also questioned the propriety of the *Blood* majority's reliance on *Smith*, particularly in light of the fact that the portion of the *Smith* decision cited by *Blood* was dicta. *See id.* at 799-800 (Orie Melvin, J., dissenting)

Our conclusions also comport with another decision in this district, in a case strikingly similar to ours: *Nationwide Mutual Insurance Co. v. Merdjian*, Civ. A. No. 03-5153, 2005 WL 545299 (E.D. Pa. Mar. 7, 2005).  In *Merdjian*, the insured purchased an insurance policy in 1990 providing bodily injury liability coverage limited to $25,000/$50,000.  At the same time, he signed a form entitled "Uninsured Motorist Coverage Authorization Form" selecting UM/UIM coverage limits of $15,000/$30,000.  *Merdjian*, 2005 WL 545299 at *1.  Several years later, he increased his bodily injury coverage to $100,000/$300,000.  *Id.*  Merdjian contended that the insurer was obligated to provide UM/UIM coverage in amounts equal to his liability coverage because when he increased his bodily injury limits he did not sign a new form reducing the UM/UIM coverage.  *Id.* at *2.  The court (Baylson, J.) determined that a new written request for reduced UM/UIM coverage was not required when the policy's bodily injury liability limits were increased.  *Id.* at *6.  The court noted that because the MVFRL did not require that an insurer provide a new opportunity for the *rejection* of UM/UIM coverage when bodily injury liability limits were increased, it would be illogical to require a new affirmation to purchase *reduced* UM/UIM coverage when bodily injury

liability limits were increased. *Id.*[21]  Therefore, the court concluded, once an insured had elected in writing either to reject or reduce UM/UIM coverage, that decision would remain in effect until the insured indicated otherwise in writing.  *Id.*

We agree with Judge Baylson's analysis in *Merdjanian*.  As in *Merdjanian*, the first named insured in this case, Mrs. Hughes, made a request in writing at the inception of the policy for UM/UIM coverage in specified amounts less than the bodily injury liability limits.  She affirmed her request for UIM coverage limited to $25,000 per person and $50,000 per accident in the Act 6 forms she completed and returned to State Farm in 1990.  Although the Hugheses subsequently increased their bodily injury liability limits from $50,000 per person and $100,000 per accident to $100,000 per person and $300,000 per accident, they did not request any change be made in their UIM coverage.  *See* Stip. ¶¶ 15-16.  The MVFRL does not state that the failure by an insurer to obtain an *additional* request in writing for reduced UM/UIM coverage after a modification of the policy's bodily injury liability limits results in UM/UIM coverage equal to liability limits.  *Accord, Merdjanian*, 2005 WL 545299 at *7.  Moreover, such a requirement would "not further the MVFRL's policy objective of containing insurance costs by allowing consumer choices that result in reduced premiums," *id.*, particularly where, as here, the insureds previously opted for UM/UIM coverage at amounts other than their bodily injury liability limits.[22]  We will not impose such a

---

[21] Again, the context in *Merdjanian* was such that the UIM limits were already lower than the bodily injury liability limits at the time the insured sought to raise his bodily injury liability limits.  It was not a case in which, as in *Cebula*, UIM limits had been equal to bodily injury liability limits.

[22] We note again that State Farm apparently consistently billed the Hugheses for UM/UIM coverage at the premium rate associated with coverage of $25,000/$50,000.  *See* Exs. A, D, E, H.  This coverage was listed on the semi-annual renewal notices sent to the Hugheses.  *See* Exs. D, H (renewal notices covering 1997 to 2005).

requirement on State Farm here.  As a result, for the reasons set out within, we conclude that the Hugheses' 1987 election of UIM coverage limited to $25,000 per person and $50,000 per occurrence, which was reaffirmed by Mrs. Hughes's execution of the Act 6 forms in 1990, remained in effect on September 27, 2001, notwithstanding their 1997 alteration to the bodily injury liability component of their coverage.

## VII.   CONCLUSION

We believe that the Pennsylvania Supreme Court would agree that the Hugheses requested in writing UIM coverage in the amount of $25,000 per person and $50,000 per accident when they purchased their policies in 1987 and that they affirmed this election in another writing in 1990.  We further believe that the Supreme Court would recognize that the Hugheses' election for reduced UIM coverage was not impacted by their 1997 increase to their bodily injury liability coverage limits.  We find that the 1997 changes did not impose upon State Farm any duty to obtain another written request from the Hugheses for UIM coverage in amounts other than the bodily injury liability limits, nor did it automatically raise the Hugheses' UIM limits to the bodily injury liability limits.  As State Farm did not violate Section 1731 or 1734, it is not obligated to the Hugheses beyond the UIM limits stated in the policy declarations as of the time of Mr. Hughes's 2001 accident.

An appropriate Order follows.